## STATE OF CONNECTICUT *v.* ARNOLD BELL
### (SC 18715)

Rogers, C. J., and Norcott, Palmer, Zarella, McLachlan, Eveleigh and Harper, Js.

Argued April 25—officially released December 27, 2011

*Jeffrey C. Kestenband*, special public defender, with whom was *William H. Paetzold*, for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, *Gary Nicholson*, senior assistant state's attorney, and *Kevin Doyle*, assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. The defendant, Arnold Bell, was convicted, following a jury trial, of assault in the first degree in violation of General Statutes § 53a-59 (a) (5), carrying a pistol without a permit in violation of General Statutes (Rev. to 2001) § 29-35 (a), and criminal possession of a pistol in violation of General Statutes (Rev. to 2001) § 53a-217c (a) (1). After further findings by the jury on a second part of the information and a subsequent hearing by the court, the trial court enhanced the defendant's sentence for being a persistent dangerous felony offender in violation of General Statutes (Rev. to 2001) § 53a-40,[1] and for committing a class A, B or C felony

---

[1] General Statutes (Rev. to 2001) § 53a-40 provides in relevant part: "(a) A persistent dangerous felony offender is a person who:

"(1) (A) Stands convicted of manslaughter, arson, kidnapping, robbery in the first or second degree, or assault in the first degree, and (B) has been, prior to the commission of the present crime, convicted of and imprisoned under a sentence to a term of imprisonment of more than one year or of death, in this state or in any other state or in a federal correctional institution,

with a firearm in violation of General Statutes § 53-202k. The defendant appealed directly to this court from the judgment of conviction, claiming, inter alia, that the trial court had violated his constitutional rights to due process and a jury trial because the court, rather than the jury, found that the state had established the necessary factual predicate for his sentence enhancement under § 53a-40 (h). See *State* v. *Bell*, 283 Conn. 748, 752–53, 931 A.2d 198 (2007). This court concluded that § 53a-40 (h) was unconstitutional to the extent that it required the trial court to make the requisite finding, that is, that the defendant's extended incarceration would best serve the public interest. See id., 810. We further determined that the legislature would have intended that the remainder of the statute continue to operate independently with the jury as the fact finder on the issue of whether extended incarceration would best serve the public interest. See id., 811–12. Accordingly, we reversed that portion of the judgment and remanded the case to the trial court for a new sentencing proceeding at which the jury would make the requisite finding. Id., 812–13. On remand, the jury found that

---

for any of the following crimes: (i) The crimes enumerated in subparagraph (A) of this subdivision or an attempt to commit any of said crimes . . . .

\* \* \*

"(h) When any person has been found to be a persistent dangerous felony offender, and the court is of the opinion that such person's history and character and the nature and circumstances of such person's criminal conduct indicate that extended incarceration and lifetime supervision will best serve the public interest, the court, in lieu of imposing the sentence of imprisonment authorized by section 53a-35 for the crime of which such person presently stands convicted, or authorized by section 53a-35a if the crime of which such person presently stands convicted was committed on or after July 1, 1981, shall sentence such person to a term of imprisonment of not more than forty years . . . ."

Although General Statutes (Rev. to 2001) § 53a-40 (d) was amended in 2001; see Public Acts 2001, No. 01-84, § 18; that particular subsection is not relevant to this appeal. In the interest of simplicity, all references in this opinion to § 53a-40 are to the 2001 revision, unless otherwise noted.

extended incarceration of the defendant would best serve the public interest, and the trial court again imposed an enhanced sentence pursuant to § 53a-40 (h). The defendant then filed this appeal,[2] claiming that the trial court improperly (1) denied his motion to dismiss the second part of the information on the ground that the retroactive application to him of the constitutional gloss that this court placed on § 53a-40 (h) in *Bell* violated the ex post facto clause of the United States constitution,[3] (2) construed the term "public interest," as used in § 53a-40 (h), to exclude considerations of the costs of incarceration, (3) precluded the defendant from introducing expert testimony about his anticipated release date from a concurrent federal sentence, and (4) admitted evidence of the details of the victim's injuries. We affirm the judgment of the trial court.

The record reveals the following undisputed facts and procedural history. The defendant was convicted of assault in the first degree, carrying a pistol without a permit, and criminal possession of a pistol in connection with the shooting of Robert Fumiatti, a New Haven police officer, on June 13, 2002. Id., 751–52, 755. After the jury returned its guilty verdict, the state presented its evidence on the second part of the information, in which the state charged the defendant with being a persistent dangerous felony offender because, prior to his conviction in the present case of assault in the first degree, he had been convicted of robbery in the first degree. Id., 786. The jury found that the state had proved the two convictions and that the defendant was a persistent offender within the meaning of § 53a-40. See id.,

---

[2] The defendant appealed to the Appellate Court from the judgment of the trial court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[3] The constitution of the United States, article one, § 10, provides in relevant part: "No State shall . . . pass any . . . ex post facto Law . . . ."

786–87. Thereafter, the trial court, *Devlin, J.*, conducted a hearing on the question of whether the defendant's "history and character and the nature and circumstances of [his] criminal conduct indicate that extended incarceration and lifetime supervision will best serve the public interest . . . ." General Statutes (Rev. to 2001) § 53a-40 (h). The trial court concluded that extended incarceration of the defendant would best serve the public interest and imposed a sentence of forty years on the assault charge, effectively doubling the otherwise prescribed maximum term of imprisonment of twenty years.[4] *State* v. *Bell*, supra, 283 Conn. 787–88; see General Statutes (Rev. to 2001) § 53a-35a (5).

On appeal to this court, the defendant challenged the propriety of his enhanced sentence pursuant to § 53a-40 (h), claiming that, under *Apprendi* v. *New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), and its progeny, the jury, not the trial court, was required to decide whether the defendant's extended incarceration would best serve the public interest. See *State* v. *Bell*, supra, 283 Conn. 753. This court agreed with the defendant that § 53a-40 (h) was unconstitutional under *Apprendi* insofar as the statute does not provide that a defendant is entitled to have the jury consider the question of whether an enhanced sentence is warranted under § 53a-40 (h). See id., 810. After concluding that "the legislature would have adopted [§ 53a-40 (h)] without the requirement that *the court* make the requisite public interest finding"; (emphasis in original) id., 812; we remedied the constitutional infirmity by excising from § 53a-40 (h) the language " 'the court is of the

---

[4] The trial court also imposed a five year concurrent term of imprisonment for the conviction of carrying a pistol without a permit, a five year concurrent term of imprisonment for the conviction of criminal possession of a pistol, and a five year consecutive term of imprisonment as a sentence enhancement for committing a class A, B or C felony with a firearm, for a total effective term of imprisonment of forty-five years.

opinion that' "; id., 811–12; and remanded the case to the trial court for "a new sentencing proceeding [at which] the jury [would] make the determination, beyond a reasonable doubt, whether, upon consideration of the relevant factors [in] § 53a-40 (h), extended incarceration [would] best serve the public interest." Id., 812–13.

On remand, a trial on the public interest issue was held before the court, *Licari, J.* When the jury was unable to agree unanimously on a verdict, the trial court declared a mistrial, and a new trial was ordered. Before retrial, the defendant filed a motion to dismiss the second part of the information on the ground that this court in *State* v. *Bell*, supra, 283 Conn. 810, had concluded § 53a-40 (h) was unconstitutional and that "[t]he retroactive application of an unconstitutional statute to [the defendant] violates his right to due process and [is] against the imposition of ex post facto laws." The trial court, *Blue, J.*, denied the motion.

At trial, the state presented evidence from which the jury reasonably could have found that the defendant committed the offenses in the manner described in our opinion in *State* v. *Bell*, supra, 283 Conn. 753–58. The state also presented evidence that, between 1983 and 2002, the year of his arrest in the present case, the defendant had been convicted of first degree robbery, third degree robbery, possession of narcotics, possession of narcotics with intent to sell, conspiracy to sell narcotics, possession of a firearm by a convicted felon and third degree assault, and had spent extended periods in prison. The defendant committed a number of these crimes while he was in prison, on furlough or on probation. Indeed, the defendant was on supervised release from federal prison, where he was serving a sentence for a federal firearms violation, when he shot Fumiatti.

The defendant presented evidence that the area of the city of New Haven where he lived was dangerous and that drive-by shootings were common.[5] A childhood friend of the defendant, Penny Toney, testified that, despite having grown up in this dangerous neighborhood, the defendant was friendly and respectful; he would ensure that she arrived home safely after block parties and dances that they had attended when they were younger; he would help neighbors carry groceries; he married his pregnant girlfriend; and he took care of their daughter, Ahmia Bell. Ahmia Bell testified that the defendant was a good father when he was not in prison. The defendant also presented evidence that he was employed when he committed the offenses at issue in the present case and that he was a good employee. Finally, the defendant adduced evidence that, while he was in prison, he had been mature, responsible, cooperative and industrious, and that, during one period of incarceration, he had attended a daily school program and had volunteered to assist other inmates.

The jury found that the state had proven beyond a reasonable doubt that the defendant's history and character and the nature and circumstances of his criminal conduct indicated that his extended incarceration would best serve the public interest pursuant to § 53a-40 (h), and the trial court, *Blue, J.*, imposed the same sentence for the assault conviction that the court, *Devlin, J.*, had imposed after the first trial, that is, forty years imprisonment.[6] This appeal followed.

I

We first address the defendant's claim that the trial court improperly denied his motion to dismiss the sec-

[5] The defendant apparently introduced this evidence to raise an inference that he had shot Fumiatti because he did not know that Fumiatti was a police officer but believed that Fumiatti and other police officers were engaged in a drive-by shooting.

[6] Accordingly, the defendant's effective term of imprisonment after remand again totaled forty-five years. See footnote 4 of this opinion.

ond part of the information because the retroactive application of this court's ruling in *State* v. *Bell*, supra, 283 Conn. 810, to the defendant violates the ex post facto clause. Specifically, the defendant contends that § 53a-40 (h), as modified by this court in *Bell*, is inoperable because it does not provide for any fact finder on the issue of public interest,[7] and the retroactive application of this court's conclusion in *Bell* that the jury must act as the fact finder on that issue violates the ex post facto clause. The defendant further argues that, even if the application of § 53a-40 (h) to him does not violate the ex post facto clause, this court's determination in *Bell* that the portion of the statute that we did not excise is severable and should continue to operate as modified was incorrect as a matter of statutory interpretation.[8] We disagree with both claims.[9]

[7] After this court in *State* v. *Bell*, supra, 283 Conn. 811–12, excised the phrase " 'the court is of the opinion that' " from General Statutes (Rev. to 2001) § 53a-40 (h), that subsection provided in relevant part: "When any person has been found to be a persistent dangerous felony offender, and . . . such person's history and character and the nature and circumstances of such person's criminal conduct indicate that extended incarceration and lifetime supervision will best serve the public interest, the court, in lieu of imposing the sentence of imprisonment authorized by . . . section 53a-35a . . . shall sentence such person to a term of imprisonment of not more than forty years . . . ."

[8] Although the defendant's claim implicates the principles embodied in the ex post facto clause, the claim is more properly characterized as arising under the due process clause. See, e.g., *Rogers* v. *Tennessee*, 532 U.S. 451, 456, 121 S. Ct. 1693, 149 L. Ed. 2d 697 (2001) ("As the text of the [ex post facto] [c]lause makes clear, it is a limitation [on] the powers of the [l]egislature, and does not of its own force apply to the [j]udicial [b]ranch of government . . . . [H]owever, [the] limitations on ex post facto judicial decisionmaking are inherent in the notion of due process." [Citation omitted; internal quotation marks omitted.]).

[9] We note, at the outset, that our review of the defendant's claim is de novo. See, e.g., *State* v. *Thomas*, 296 Conn. 375, 383, 995 A.2d 65 (2010) ("[b]ecause a motion to dismiss effectively challenges the jurisdiction of the court, asserting that the state, as a matter of law and fact, cannot state a proper cause of action against the defendant, our review of the court's legal conclusions and resulting denial of the defendant's motion to dismiss is de novo" [internal quotation marks omitted]).

"The ex post facto prohibition forbids . . . the [s]tates [from] enact[ing] any law [that] imposes a punishment for an act [that] was not punishable at the time it was committed . . . or imposes additional punishment to that then prescribed. . . . Through this prohibition, the [f]ramers sought to assure that legislative [a]cts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed. . . . [T]wo critical elements must be present for a criminal or penal law to be ex post facto: it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it." (Citation omitted; internal quotation marks omitted.) *State* v. *Courchesne*, 296 Conn. 622, 727, 998 A.2d 1 (2010). Similarly, under the due process clause, if a court's constitutional gloss on a statute was unforeseeable and disadvantaged a defendant, it cannot be given retroactive effect. Id., 728 ("limitations on ex post facto judicial decisionmaking are inherent in the notion of due process" [internal quotation marks omitted]).

"It is . . . well settled . . . that [t]he inhibition upon the passage of ex post facto laws does not give a criminal a right to be tried, in all respects, by the law in force when the crime charged was committed. . . . [T]he constitutional provision was intended to secure substantial personal rights against arbitrary and oppressive legislation . . . and not to limit the legislative control of remedies and modes of procedure [that] do not affect matters of substance." (Citations omitted; internal quotation marks omitted.) *Dobbert* v. *Florida*, 432 U.S. 282, 293, 97 S. Ct. 2290, 53 L. Ed. 2d 344 (1977). "Even though it may work to the disadvantage of a defendant, a procedural change is not ex post facto." Id.; see also *Payne* v. *Fairfield Hills Hospital*, 215 Conn. 675, 683, 578 A.2d 1025 (1990) ("changes in procedural

law do not ordinarily give rise to violations of the prohibition against ex post facto laws").

In the present case, the statutory modification that was achieved by this court's excision of the language, " 'the court is of the opinion that,' " from § 53a-40 (h) in *State* v. *Bell*, supra, 283 Conn. 811–12, coupled with our conclusion that the jury must make the finding that extended incarceration of the defendant will best serve the public interest, resulted in an ameliorative change to the provision that is merely procedural. See *Dobbert* v. *Florida*, supra, 432 U.S. 289–94 (when capital felony statute providing that person convicted of capital felony would be sentenced to death unless majority of jury recommended mercy was found unconstitutional, and statute then was amended by legislature to require that jury render advisory decision on basis of aggravating and mitigating circumstances and that trial court then weigh those circumstances before imposing death sentence, change was "procedural" and "ameliorative," and application of amended statute to defendant who committed crime when original statute was in effect did not violate ex post facto clause); see also id., 294 (amendment was procedural and did not implicate ex post facto clause when "[t]he crime for which the . . . defendant was indicted, the punishment prescribed therefor, and the quantity or the degree of proof necessary to establish his guilt, all remained unaffected by the subsequent statute" [internal quotation marks omitted]). Thus, the change that we directed in *Bell* did not make the punishment under § 53a-40 (h) more onerous. See, e.g., *United States* v. *Zagari*, 111 F.3d 307, 323 (2d Cir.) ("[a]n ex post facto problem arises [only] if the version [of the statute] in effect at the time of sentencing makes more onerous the punishment for crimes committed before its enactment" [internal quotation marks omitted]), cert. denied sub nom. *Herzog* v. *United States*, 522 U.S. 983, 118 S. Ct. 445, 139 L. Ed. 2d 381

(1997), and cert. denied sub nom. *Shay* v. *United States*, 522 U.S. 988, 118 S. Ct. 455, 139 L. Ed. 2d 390 (1997). Rather, it affected only the procedure pursuant to which a defendant is tried under the provision. In such circumstances, it cannot be said that the defendant was disadvantaged retroactively by the statutory modification. See *California Dept. of Corrections* v. *Morales*, 514 U.S. 499, 506–507 n.3, 115 S. Ct. 1597, 131 L. Ed. 2d 588 (1995) ("the focus of the ex post facto inquiry is not on whether a [statutory] change produces some ambiguous sort of 'disadvantage' . . . but on whether any such change alters the definition of criminal conduct or increases the penalty by which a crime is punishable" [citation omitted]). Accordingly, we conclude that the retroactive application to the defendant of § 53a-40 (h), as modified by the constitutional gloss that this court placed on it in *Bell*, does not violate ex post facto principles embodied in the due process clause of the fourteenth amendment.

The defendant also contends, however, that the excised statute does not apply to him because, at the time that he committed the offenses, no constitutionally sound persistent dangerous felony offender statute was in effect. In *Dobbert* v. *Florida*, supra, 432 U.S. 282, the United States Supreme Court rejected a similar argument. The petitioner in *Dobbert* had claimed that, because the death penalty statute in effect at the time that he committed the capital offenses was later determined to be unconstitutional, "there was no death penalty 'in effect' " at the time of the offenses. Id., 297. The court concluded that "this sophistic argument mocks the substance of the [e]x [p]ost [f]acto [c]lause. Whether or not the old statute would, in the future, withstand constitutional attack, it clearly indicated [the state's] view of the severity of murder and of the degree of punishment [that] the legislature wished to impose [on] murderers. The statute was intended to provide maxi-

mum deterrence, and its existence on the statute books provided fair warning as to the degree of culpability [that] the [s]tate ascribed to the act of murder." Id. The court thus concluded that the existence of the unconstitutional statute at the time of the offense "was sufficient compliance with the ex post facto provision of the United States [c]onstitution." Id., 298. Similarly, for purposes of the present case, § 53a-40 (h) clearly reflected the legislature's negative view of persistent dangerous felony offenders and the degree of punishment that it wished to impose on them at the time that the defendant committed the offenses. Consequently, the defendant was on fair notice that the substantive provisions of the persistent dangerous felony offender statute would apply to him even if certain procedural provisions were later found to be unconstitutional.

We next address the defendant's claim that this court improperly concluded in *Bell* that the legislature would have intended the constitutional portion of § 53a-40 (h) that this court did not excise to remain operational, with the jury acting as the fact finder on the question of whether extended incarceration of the defendant would best serve the public interest. Essentially, the defendant claims that it was speculative for this court to conclude that the legislature would have enacted § 53a-40 (h) in precisely the same form as the statute as modified by this court in *Bell* if it had known that the trial court constitutionally could not make the finding that extended incarceration would best serve the public interest. In support of this claim, the defendant notes that, after this court's decision in *Bell*, the legislature amended § 53a-40 (h) to eliminate entirely the requirement of a finding that extended incarceration is in the public interest. See Public Acts 2008, No. 08-51, § 1 (P.A. 08-51), codified at General Statutes (Rev. to 2009) § 53a-40 (h).[10]

---

[10] General Statutes (Rev. to 2009) § 53a-40 (h) provides: "When any person has been found to be a persistent dangerous felony offender, the court, in

As this court stated in *Bell*, in determining the appropriate remedy when a portion of a statute has been found unconstitutional, "[w]e seek to determine what [the legislature] would have intended in light of the [c]ourt's constitutional holding. . . . *United States* v. *Booker*, [543 U.S. 220, 246, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005)]. Thus, [g]uiding the solution is the maxim that this court will strive to interpret a statute so as to sustain its validity . . . and [to] give effect to the intention of the legislature. . . . [In enacting] General Statutes § 1-3[11] the legislature has shown its intention that there is to be a presumption of separability of the provisions and of the applications of statutes. . . . With regard to the separability of provisions, to overcome the presumption it must be shown that the portion declared invalid is so mutually connected and dependent on the remainder of the statute as to indicate an intent that they should stand or fall together . . . and this interdependence would warrant a belief that the legislature would not have adopted the remainder of the

lieu of imposing the sentence of imprisonment authorized by the general statutes for the crime of which such person presently stands convicted, shall (1) sentence such person to a term of imprisonment that is not (A) less than twice the minimum term of imprisonment authorized for such crime of (B) more than twice the maximum term of imprisonment authorized for such crime or forty years, whichever is greater, provided, if a mandatory minimum term of imprisonment is authorized for such crime, such sentence shall include a mandatory minimum term of imprisonment that is twice such authorized mandatory minimum term of imprisonment, and (2) if such person has, at separate times prior to the commission of the present crime, been twice convicted of and imprisoned for any of the crimes enumerated in subsection (a) of this section, sentence such person to a term of imprisonment that is not less than three times the minimum term of imprisonment authorized for such crime or more than life, provided, if a mandatory minimum term of imprisonment is authorized for such crime, such sentence shall include a mandatory minimum term of imprisonment that is three times such authorized mandatory minimum term of imprisonment."

[11] General Statutes § 1-3 provides: "If any provision of any act passed by the General Assembly or its application to any person or circumstances is held invalid, such invalidity shall not affect other provisions or applications of such act."

statute independently of the invalid portion." (Internal quotation marks omitted.) *State* v. *Bell*, supra, 283 Conn. 810–11. We further observed, with respect to the enactment of § 53a-40 (h) specifically, that, "[g]iven the overwhelming evidence in the [pertinent] legislative history . . . [of] § 53a-40 that the legislature's intent was to keep those violent, persistent offenders who were most likely to reoffend and put the public at risk off the streets for an extended period . . . the . . . portion of the statute [that remains following the excision of the requirement that the court make the requisite public interest finding] can operate independently and effectively to achieve that intent." (Citation omitted.) Id., 812.

Contrary to the defendant's suggestion in the present case, upon finding a portion of a statute to be unconstitutional, this court does not ask whether, if the legislature had known about the constitutional flaw *at the time of enactment*, it might have preferred some other form of legislation over the remaining constitutional portion of the statute, a question that might well engage the court in speculation. Rather, this court asks the much narrower question of whether the legislature, *at the time that the statute is invalidated*, would prefer the continued operation of the constitutional portion of the statute or the complete invalidation of the statute.[12] See *United States* v. *Booker*, supra, 543 U.S. 246

---

[12] As we indicated, we stated in *Bell* that the constitutional portion of a statute cannot operate independently if "the legislature would not have adopted [the valid portion] of the statute independently of the invalid portion." (Internal quotation marks omitted.) *State* v. *Bell*, supra, 283 Conn. 811. This does not mean, however, that the constitutional portion of the statute cannot continue to operate independently unless this court determines that the legislature would have enacted it in *precisely the same form* if it had known of the constitutional flaw at the time of enactment. Because this court would seldom be able to make that determination, any such conclusion would be inconsistent with the statutory presumption of severability set forth in § 1-3 and with the principle that courts must endeavor to give effect to the intent of the legislature to the maximum extent possible.

In the present case, for example, it is quite possible that, if the legislature had known about the constitutional flaw in § 53a-40 (h) at the time of

("[w]e seek to determine what [the legislature] would have intended *in light of the [c]ourt's constitutional holding*" [emphasis added; internal quotation marks omitted]); id., 249 (when portion of statute is determined to be unconstitutional, question that court must determine is what remedy legislature would prefer at that time); see also id., 247 (in crafting appropriate remedy when portion of statute is found unconstitutional, court must determine whether it "would deviate less radically" from legislative intent by superimposing constitutional requirements or excising unconstitutional provisions); id. ("severability questions . . . can arise when a legislatively unforeseen constitutional problem requires modification of a statutory provision as applied").

The defendant in the present case has pointed to no evidence that the legislature would have preferred for this court, upon invalidating the requirement that the trial court make the public interest finding, to have invalidated § 53a-40 (h) in its entirety instead of excising the unconstitutional portion of the statute and requiring the jury to make the requisite finding. In light of the statutory presumption that unconstitutional provisions of a statute are severable; see General Statutes § 1-3; and given the clear legislative purpose of § 53a-40 (h) to promote the extended incarceration of those violent, persistent offenders who are most likely to place the public at risk by reoffending; *State* v. *Bell*, supra, 283

enactment, it would have enacted a persistent dangerous felony offender statute without any requirement of a finding that extended incarceration would best serve the public interest, as it did after this court's decision in *Bell*. See footnote 10 of this opinion and accompanying text. Such a statute, however, would be *substantively* similar to § 53a-40 (h). Because we remain wholly unpersuaded that the legislature would have enacted *no* persistent dangerous felony offender statute if it had known about the constitutional flaw in § 53a-40 (h), or a substantively different statute, we see no reason to reconsider our determination that the constitutional portion of § 53a-40 (h) may continue to operate.

Conn. 812; we reaffirm our conclusion that the legislature would prefer the remedy of allowing the continued operation of the constitutional portion of § 53a-40 (h) instead of the remedy of invalidating the statute in its entirety.

## II

The defendant next contends that the trial court improperly denied his motion in limine to introduce evidence of the costs of his incarceration in support of his argument that his extended incarceration would not best serve the public interest. We reject the defendant's claim.

At trial before the court, *Blue, J.*, the defendant filed a motion in limine to introduce evidence of the costs of his incarceration.[13] He argued that the term "public interest," as used in § 53a-40 (h), "includes considerations of the general welfare of the public, including financial costs to the taxpayers of incarcerating an individual." The trial court denied the motion upon concluding that the term "public interest," as used in § 53a-40 (h), means the interest of the public in protecting itself from dangerous individuals and does not include the public interest in minimizing public expenditures. On appeal, the defendant renews the argument that he made in the trial court concerning the meaning of the term "public interest." The state maintains that the trial court was correct in its conclusion with respect to the meaning of that term for purposes of § 53a-40 (h).

---

[13] In addition to filing the motion in limine, the defendant submitted two requests to charge that defined the term "public interest" as " 'the general welfare and rights of the public that are to be recognized, protected and advanced.' " The trial court denied the requests to charge and instructed the jury that "[t]he term 'public interest' means the interest of the public in protecting itself from dangerous individuals combined with the responsibility shared by every public tribunal of dealing with the defendant fairly and justly . . . ."

The meaning of the term "public interest," as used in § 53a-40 (h), is a question of statutory interpretation over which our review is plenary. See, e.g., *State ex rel. Gregan* v. *Koczur*, 287 Conn. 145, 152, 947 A.2d 282 (2008). "In making such determinations, we are guided by fundamental principles of statutory construction." *In re Matthew F.*, 297 Conn. 673, 688, 4 A.3d 248 (2010); see General Statutes § 1-2z.[14] "[O]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature." (Internal quotation marks omitted.) *Testa* v. *Geressy*, 286 Conn. 291, 308, 943 A.2d 1075 (2008).

We begin with the language of the statute. General Statutes (Rev. to 2001) § 53a-40 (h) provides in relevant part: "When any person has been found to be a persistent dangerous felony offender, and . . . such person's history and character and the nature and circumstances of such person's criminal conduct indicate that extended incarceration and lifetime supervision will best serve the public interest, the court . . . shall sentence such person to a term of imprisonment of not more than forty years . . . ."

The term "public interest," as used in § 53a-40 (h), is not statutorily defined. Moreover, the parties do not claim that the term plainly and unambiguously either includes or excludes the public interest in minimizing the costs of incarceration, and we agree that it does not. Accordingly, in determining the meaning of the term, "we . . . look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to

---

[14] General Statutes § 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."

implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *In re Jan Carlos D.*, 297 Conn. 16, 21, 997 A.2d 471 (2010).

The fact that General Statutes (Rev. to 2001) § 53a-40 (h) directs the fact finder to determine whether the defendant's "history and character and the nature and circumstances of such person's criminal conduct indicate that extended incarceration and lifetime supervision will best serve the public interest" strongly supports the statutory construction adopted by the trial court and urged by the state. Under the doctrine of expressio unius est exclusio alterius—the expression of one thing is the exclusion of another—we may infer from this language that the legislature intended that the fact finder shall focus exclusively on the defendant's history and character and the nature and circumstances of his criminal conduct in deciding whether extended incarceration would best serve the public interest. See *Honulik* v. *Greenwich*, 293 Conn. 641, 694 n.5, 980 A.2d 845 (2009) (*Zarella, J.*, dissenting) ("[w]hen the items expressed are members of an associated group or series, we may invoke the canon of statutory construction known as expressio unius est exclusio alterius . . . and infer that the item not mentioned . . . was excluded by deliberate choice" [internal quotation marks omitted]). If the legislature had intended for the fact finder also to consider the costs of incarceration in determining whether a sentence enhancement is appropriate under § 53a-40 (h), it easily could have made that intention clear by so providing.

This conclusion is consistent with sentencing principles generally, which, broadly stated, require the court "[to] fashion a sentence that fits the crime and the criminal." (Internal quotation marks omitted.) *State* v. *Wade*, 297 Conn. 262, 274, 998 A.2d 1114 (2010); see *State* v. *Garvin*, 43 Conn. App. 142, 152, 682 A.2d 562

(1996) ("[f]or the determination of sentences, justice generally requires consideration of more than the particular acts for which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender" [internal quotation marks omitted]), aff'd, 242 Conn. 296, 699 A.2d 921 (1997); *State* v. *Patterson*, 37 Conn. App. 801, 819, 658 A.2d 121 (1995) (court ordinarily imposes sentence on basis of "presentence inquiry into the circumstances of the offenses, the attitude of the victim or his [or her] immediate family, the criminal record, social history and present condition of the defendant, and, if desirable, the mental and physical state of the defendant" [internal quotation marks omitted]), rev'd on other grounds, 236 Conn. 561, 674 A.2d 416 (1996); see also General Statutes § 54-91a (c) ("[w]henever [a presentence] investigation is required, the probation officer shall promptly inquire into the circumstances of the offense, the attitude of the complainant or victim, or of the immediate family where possible in cases of homicide, and the criminal record, social history and present condition of the defendant"). The defendant has referred to no authority for the proposition that a sentencing court, in determining an appropriate sentence, ordinarily may consider the costs of incarceration as a factor, in addition to the traditional sentencing goals of retribution, rehabilitation and specific and general deterrence.[15] Rather, it

---

[15] See, e.g., *Ewing* v. *California*, 538 U.S. 11, 27, 123 S. Ct. 1179, 155 L. Ed. 2d 108 (2003) (primary goal of recidivist statutes is to deter repeat offenders and to isolate dangerous criminals from society); *Rhodes* v. *Chapman*, 452 U.S. 337, 352, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981) ("the goals of the penal function in the criminal justice system [are] to punish justly, to deter future crime, and to return imprisoned persons to society with an improved chance of being useful, law-abiding citizens"); *United States* v. *Terry*, 427 F. Sup. 2d 1132, 1137 (M.D. Ala. 2006) ("[t]he primary goal of sentencing is to impose a sentence that is sufficient, but not greater than necessary, to punish the offender, protect the public from further crimes by the defendant, rehabilitate the defendant, and deter other people from committing similar crimes").

appears that, as a general matter, to the extent that the economic costs of incarceration are a factor in determining an appropriate sentence, they are to be considered not by the sentencing authority but by the legislature when it is enacting sentencing provisions.[16] See, e.g., *United States* v. *Wong*, 127 F.3d 725, 728 (8th Cir. 1997) (because "[t]he decision whether tax dollars should be used to pay for lengthy sentences is a congressional determination, not one to be made by federal courts," and because "[t]he [federal] [s]entencing [g]uidelines do not mention the expenses of imprisonment as a factor a court may use in deciding whether to depart from the [g]uidelines," District Court should not have considered that factor in imposing sentence).

Indeed, the legislative history of § 53a-40 (h) demonstrates that, during the debate on the 1994 amendment that changed the punishment for being a persistent dangerous felony offender from the sentence authorized for a class A felony to a term of imprisonment of not more than forty years; see Public Acts 1994, No. 94-37, § 1, codified at General Statutes (Rev. to 1995) § 53a-40 (f); the legislature considered and rejected objections to the extended incarceration of repeat dangerous felony offenders based on economic considerations.[17] It would

---

[16] We do not mean to suggest that a sentencing court may never, under any circumstances, properly consider the costs of incarceration in determining the appropriate sentence. Indeed, we express no opinion on the issue generally; for purposes of the present case, it suffices to say that that consideration is not contemplated under § 53a-40 (h). It bears emphasis, however, that, to the extent that such a consideration arguably might be proper as one of many factors to be weighed in some other case, it is a factor that is even less germane to a sentencing decision involving a violent, repeat offender whom the legislature expressly has identified as one requiring an extraordinary, extended period of incarceration for the protection of society.

[17] See H.R. Proc., Pt. 8, 1994 Sess., pp. 2929–30, remarks of Representative William R. Dyson (arguing that enactment of legislation would "increase the demand for prison beds" and greatly increase expenditures for prisons, requiring state to reduce spending for other programs); id., pp. 2930–33, remarks of Representative Jefferson B. Davis (arguing that enactment of legislation would require taking "limited [state] resources" away from other

be incongruous to conclude that the legislature, having rejected the argument that extended incarceration of repeat offenders would be too costly to the state, would have intended for the fact finder to consider the costs of incarceration in determining whether extended incarceration best serves the public interest. We conclude, therefore, that the trial court properly construed the term "public interest," as used in § 53a-40 (h), to mean the public's interest in protecting itself from dangerous criminals and in imposing a fair sentence on the basis of the defendant's history and character and the nature and circumstances of his criminal conduct, and to preclude any consideration of the costs of incarceration. Accordingly, the trial court properly denied the defendant's motion in limine seeking to introduce evidence of the costs of his incarceration.

### III

We next address the defendant's claim that the trial court improperly precluded him from introducing expert testimony on the anticipated length of his federal sentence. The defendant contends that this evidence was relevant to the question of whether extended incarceration would best serve the public interest because it demonstrated that he would be incarcerated for his federal conviction until he was approximately seventy-eight years old regardless of whether the trial court imposed an extended sentence pursuant to § 53a-40 (h). We disagree.

The following undisputed facts and procedural history are relevant to our resolution of this claim. As a result of the incident that formed the basis of the

programs and would not be appropriate response to crime problem); cf. id., pp. 2938–41, remarks of Representative James A. Tavegia (arguing that protecting citizens from criminals justifies increased expenditures for prisons); id., p. 2947, remarks of Representative Arthur J. O'Neill (arguing that economic cost of imprisoning career criminals is less than cost to society of not imprisoning them).

charges in the present case, the defendant was convicted of the federal offense of being a felon in possession of a firearm and was sentenced to forty-seven years imprisonment, to be served concurrently with his original forty-five year state sentence. During the trial before the court, *Blue, J.*, in the present case, the defendant filed a motion in limine to introduce evidence that he was serving the federal sentence. He also sought permission to introduce expert testimony by Todd A. Bussert, an attorney, that his federal sentence would expire at the end of 2043, when the defendant would be almost seventy-eight years old. The defendant argued that this evidence was relevant to establish that an extended sentence on the state charges would not best serve the public interest because he already was going to be serving a lengthy sentence in connection with his federal conviction. The trial court excluded Bussert's testimony on the ground that it was speculative because the actual length of the defendant's incarceration for his federal conviction might be affected by changes in federal policy or the defendant's behavior in prison. Specifically, the trial court concluded that it was "not the jury's job" to determine when the defendant would be released from federal prison; rather, "[t]he jury's job . . . is to weigh the statutory factors." The trial court allowed the defendant, however, to inform the jury of the fact of his federal sentence, because the sentence was part of the defendant's history, which was a statutory factor. The court also instructed the jury that the defendant was appealing from the federal sentence and that the jury was barred from speculating as to whether the sentence would be altered in the future.

We agree with the state that the trial court reasonably concluded that Bussert's testimony was inadmissible because it was speculative.[18] Although Bussert may

---

[18] Our standard of review for evidentiary claims is well settled. "To the extent [that] a trial court's admission of evidence is based on an interpretation of the [Connecticut] Code of Evidence, our standard of review is plenary.

have been qualified to testify about the probable duration of the defendant's incarceration in connection with his federal conviction, the defendant did not establish that Bussert was qualified or prepared to testify about the likelihood that the defendant would prevail in his appeal of his federal conviction, the effect that the defendant's behavior in federal prison could have on the amount of time that he actually would serve or the probability that federal sentencing law would not change within the next forty years. Thus, Bussert's proposed testimony on the anticipated length of the defendant's federal sentence would have been based on the hypothetical possibility that these factors would have no effect on the duration of the defendant's incarceration.

More fundamentally, we also conclude that Bussert's testimony was inadmissible because it was irrelevant. Although the fact of the defendant's federal sentence was relevant to show that the United States District

For example, whether a challenged statement properly may be classified as hearsay and whether a hearsay exception properly is identified are legal questions demanding plenary review." *State* v. *Saucier*, 283 Conn. 207, 218, 926 A.2d 633 (2007). "We review the trial court's decision to admit [or exclude] evidence, if premised on a correct view of the law, however, for an abuse of discretion." Id. We apply the latter standard to the trial court's evidentiary ruling in the present case.

In addition, "[t]he law defining the relevance of evidence is well settled. Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue." (Internal quotation marks omitted.) *State* v. *Johnson*, 289 Conn. 437, 462, 958 A.2d 713 (2008). "One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, [as] long as it is not [unfairly] prejudicial or merely cumulative." (Internal quotation marks omitted.) Id., 462–63.

Court viewed the defendant's conduct in a very negative light, the actual length of time that the defendant would serve under the federal sentence had no particular relevance to the defendant's "history and character and the nature and circumstances of such person's criminal conduct . . . ." General Statutes (Rev. to 2001) § 53a-40 (h). In other words, even if the jury reasonably could conclude that an extended period of incarceration pursuant to § 53a-40 (h) would not necessarily mean that the defendant actually would spend more time in prison than he otherwise would, that would not be a proper reason to conclude that his extended incarceration *pursuant to the dictates of § 53a-40 (h)* would not best serve the public interest. Accordingly, the trial court properly excluded Bussert's testimony.

IV

Finally, we address the defendant's claim that the trial court abused its discretion in admitting evidence of the details of Fumiatti's injuries because the evidence was more prejudicial than probative. We need not decide whether the trial court abused its discretion because, even if we assume that it did, any such impropriety was harmless.

Prior to trial, the defendant filed a motion in limine to exclude any evidence about the details of the injuries that Fumiatti had sustained as the result of the shooting. The defendant stated that he was willing to stipulate that he shot Fumiatti and that Fumiatti sustained serious physical injury, but argued that evidence of the specific details of the injuries and their long-term effect on Fumiatti was not relevant to the defendant's "history and character and the nature and circumstances of [his] criminal conduct"; General Statutes (Rev. to 2001) § 53a-40 (h); and was prejudicial. The court, *Blue, J.*, concluded that the details of Fumiatti's injuries were

relevant to the nature and circumstances of the crime and denied the motion on that basis.

At trial, Franklin Quicksly, a firefighter and paramedic with the New Haven fire department, testified that, when he arrived at the scene of the shooting, Fumiatti had no pulse and was not breathing. Juan Bartolomei, a neurosurgeon, testified that he was on duty at Yale-New Haven Hospital when Fumiatti arrived by ambulance. Bartolomei testified that Fumiatti was "technically dead" when he arrived at the hospital and that hospital personnel were required to "electrocute" his heart and to inject him with adrenaline in order to reestablish a pulse. After stabilizing Fumiatti, Bartolomei determined that Fumiatti had been shot in the face near his right nostril. The bullet had traveled through the back of his mouth, where it shattered a tooth, and ultimately lodged in his first cervical vertebra (C-1), which supports the skull. Bartolomei performed surgery to repair the wound, during which he removed the shattered tooth from Fumiatti's esophagus, but he elected to leave the bullet in place. To stabilize Fumiatti's skull, Bartolomei fitted him with a "halo," which is a device comprised of a ring around the head, bolted into the skull and attached by way of bars to a chest vest. Fumiatti wore the halo for approximately five and one-half months after the shooting. By that time, the area around the bullet had calcified and become part of the bone.

As a result of Fumiatti's injuries, he suffered short term paralysis from which he recovered in a matter of weeks. He continued to suffer, however, from weakness and lack of coordination in his right arm and shoulder. After eighteen months of rehabilitation, he regained some gross motor function but still had very little fine motor coordination. He also was unable to move his head from side to side.

"Although relevant, evidence may be excluded by the trial court if the court determines that the prejudicial effect of the evidence outweighs its probative value. . . . Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jur[ors]. . . . The trial court . . . must determine whether the adverse impact of the challenged evidence outweighs its probative value. . . . Finally, [t]he trial court's discretionary determination that the probative value of evidence is not outweighed by its prejudicial effect will not be disturbed on appeal unless a clear abuse of discretion is shown. . . . [B]ecause of the difficulties inherent in this balancing process . . . every reasonable presumption should be given in favor of the trial court's ruling. . . . Reversal is required only [when] an abuse of discretion is manifest or [when] injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Johnson*, supra, 289 Conn. 463.

"When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the [impropriety] was harmful. . . . [A] nonconstitutional [impropriety] is harmless when an appellate court has a fair assurance that the [impropriety] did not substantially affect the verdict." (Citation omitted; internal quotation marks omitted.) *State* v. *Orr*, 291 Conn. 642, 663, 969 A.2d 750 (2009).

In the present case, we conclude that, even if the trial court improperly admitted evidence of the details of Fumiatti's injuries and their long-term effects on him because the evidence was prejudicial and only marginally probative, we have "a fair assurance" that the evidence did not substantially affect the verdict and,

therefore, conclude that its admission was harmless. Id. In support of its claim that the extended incarceration of the defendant would best serve the public interest, the state presented strong evidence that the defendant had engaged in a lengthy and escalating pattern of criminal activity, and that he was unable or unwilling to refrain from such activity even while under the supervision of the prison system. Moreover, the defendant conceded that the evidence that he shot Fumiatti in the face and that Fumiatti was seriously injured was admissible. If the additional evidence relating to the treatment of the injuries and their long-term effects on Fumiatti was only marginally relevant to the "nature and circumstances of [the defendant's] criminal conduct"; General Statutes (Rev. to 2001) § 53a-40 (h); it also caused only incremental prejudice to the defendant. Accordingly, we conclude that the admission of the evidence was not reversible error.

The defendant's reliance on *Old Chief* v. *United States*, 519 U.S. 172, 117 S. Ct. 644, 136 L. Ed. 2d 574 (1997), in support of his claim to the contrary is misplaced. In that case, the petitioner, Johnny Lynn Old Chief, had been charged pursuant to a federal statute that made it a crime for any person who had been convicted of a crime punishable by imprisonment for more than one year to possess a firearm. Id., 174. Old Chief offered to stipulate that he previously had been convicted of such a crime, but the assistant United States attorney (prosecutor) declined to stipulate, and the District Court ruled that he was not required to do so. Id., 177. At trial, the prosecutor presented evidence that Old Chief previously had been convicted of assault and that such assault resulted in serious bodily injury to the victim. Id. On appeal, the United States Supreme Court concluded that, because, under the relevant statute, "[t]he most the jury need[ed] to know [was] that

the conviction admitted by [Old Chief fell] within the class of crimes that Congress thought should bar a convict from possessing a gun, and this point may be made readily in a defendant's admission"; id., 190–91; "the general presumption that the prosecution may choose its evidence" did not apply. Id., 191. Accordingly, the court concluded that, because Old Chief had offered to stipulate to the prior conviction, the admission of the record of conviction of assault was unduly prejudicial and was an abuse of discretion. See id., 191–92.

Unlike the statute at issue in *Old Chief*, however, § 53a-40 (h) *requires* the fact finder to consider, not just the bare fact that the defendant has been convicted of a crime but also the defendant's "history and character and the nature and circumstances of [his] criminal conduct . . . ." General Statutes (Rev. to 2001) § 53a-40 (h). Under these circumstances, the "standard rule that the prosecution is entitled to prove its case by evidence of its own choice, or, more exactly, that a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the [g]overnment chooses to present it" clearly applies. *Old Chief* v. *United States*, supra, 519 U.S. 186–87. Accordingly, although we have assumed in the present case that the evidence regarding the treatment of Fumiatti's injuries and their long-term effect on him was only marginally relevant to establish the nature and circumstances of the defendant's criminal conduct, we reject the defendant's suggestion that the state was not entitled to present *any* evidence of the nature and circumstances of his criminal conduct because he had offered to stipulate that the state had proved the elements of the crime of first degree assault.

The judgment is affirmed.

In this opinion the other justices concurred.